# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**GRETCHEN VALENCIA, individually
and on behalf of all others similarly
situated,**

      **Plaintiff,**

    **vs.**                                      **Civ. No. 18-1071  KG/JFR**

**ARMADA SKILLED HOME CARE OF
NEW MEXICO, LLC; ARMADA HOME
HEALTHCARE OF SOCORRO, LLC; and
CHRISTOPHER TAPIA,**

      **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION REGARDING PLAINTIFF'S EMERGENCY MOTION FOR PROTECTIVE ORDER, ISSUANCE OF CORRECTIVE NOTICE, AND SANCTIONS[1]

**THIS MATTER** is before the Court on Plaintiff's Emergency Motion for Protective Order, Issuance of Corrective Notice, and Sanctions ("Motion for Protective Order), filed June 25, 2020.  Doc. 48.  Defendants filed a Response on July 7, 2020.  Doc. 54.  Defendants also filed the Affidavit of Christopher Tapia on July 7, 2020.  Doc. 55.  Plaintiff filed a Reply on July 14, 2020.  Doc. 57.  Having reviewed the parties' submissions and the relevant law, and for the reasons set forth herein, the Court finds that the Plaintiff's Emergency Motion for Protective Order, Issuance of Corrective Notice, and Sanctions is not well taken and recommends that it be **DENIED**.

---

[1] By an Order of Reference filed June 30, 2020 (Doc. 51), the presiding judge referred this matter to the undersigned to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the motions.  Doc. 51.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a Registered Nurse who was employed by Defendants from October 2016 to November 2018 to provide healthcare services to patients in their homes.  Doc. 25-1 at 2, 4. Plaintiff alleges Defendants denied her and other similarly situated home healthcare workers overtime pay for all hours worked in excess of 40 hours in a workweek, in violation of the Fair Standards Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.,* the New Mexico Minimum Wage Act, 1978 §§ 50-4-20, *et seq*. ("NMMWA"), and the New Mexico Minimum Wage Payment Act ("NMWPA"), 1978 § 50-4-1, *et seq*.  Doc. 38.  Specifically, Plaintiff states that Defendants maintained a policy and practice of paying home healthcare workers on a "per event" basis for time spent visiting patients with a set visit rate for each type of visit.  *Id.* at 4. Defendants required home healthcare workers to use software called Homecare Homebase to log the time spent performing certain work tasks.  *Id.* at 5.  However, Plaintiffs allege this software does not record substantial amounts of time spent traveling between patients' homes, preparing for visits, checking and responding to email and voicemail, communicating with patients and physicians, and coordinating care with others.  *Id.*  As a result, Plaintiff claims Defendants did not pay Plaintiff and other workers overtime wages for hours worked in excess of 40 hours in a workweek.  *Id.*

On June 5, 2019, Plaintiff filed a Motion for Conditional Certification.  Doc. 25. Plaintiff's Motion sought conditional certification of a proposed class of individuals who worked for Defendants as "home health Registered Nurses, Certified Nursing Assistants, Certified Therapy Assistants, Home Health Aides, Therapy Aides, and other similarly-designated skilled and paraprofessional care positions."  Doc. 25-1 at 7.  District Judge Kenneth Gonzales concluded that Plaintiff had made substantial allegations that the putative class members were

similarly situated and granted Plaintiff's Motion.  Doc. 46 at 6.  On May 28, 2020, Judge

Gonzales entered a Memorandum Opinion and Order granting Plaintiff's Motion for Conditional

Certification.  Doc. 46.

Judge Gonzales's Order reflects that Defendants raised certain objections to Plaintiff's

proposed Notice (Doc. 25-2), which Judge Gonzales considered and ruled upon, in relevant part,

as follows:

> First, Defendants assert the Notice does not state that Plaintiff and other class
> members could be liable for Defendants' costs if Defendants prevail.  Plaintiff
> states that if this language is added to the Notice, it should clarify that the opt-in
> Plaintiffs would not be responsible for Defendants' attorney fees, and should read;
> "If Plaintiffs lose they could be responsible for paying court costs and expenses
> (not including Defendants' attorneys' fees)."  (Doc. 43) at 12.  The Court finds
> this is an acceptable compromise and will order Plaintiff to revise the Notice to
> include Plaintiff's proposed addition.
>
> . . .
>
> Finally, Defendants argue the proposed Notice is inadequate because it does not
> inform potential class members the amount of attorneys' fees they may have to
> pay out of any judgment entered in their favor.  (Doc. 39) at 17.  The Notice
> informs potential class members that Plaintiffs' attorneys "are being paid on a
> contingency fee basis, which means that if there is no recovery, there will not be
> attorneys' fees.  If there is a recovery, these attorneys will receive a part of any
> settlement obtained or money judgment entered in favor of all members of the
> collective action lawsuit."  (Doc. 25-2) at 3.  The Court agrees with Defendants
> that the Notice should specify the percentage of fees that will be paid to the
> attorneys if Plaintiffs prevail or otherwise explain how the attorneys' fees will be
> calculated.  Plaintiff shall revise the Notice to include this information.

Doc. 46 at 6-7.  The Court then ordered, *inter alia* that

> . . .
>
> 3.      Within ten (10) days of this Order, Defendants shall produce to Plaintiff a
>         computer-readable data file containing the names, addresses, email
>         addresses, telephone numbers, dates of employment, social security
>         numbers, and dates of birth for the FLSA Collective Class.
>
> 4.      Plaintiff shall revise the proposed Notice as set forth above and send the
>         revised Notice and Opt-In Consent Form by first-class U.S. Mail, email,

and text message to all members of the FLSA Collective Class. Potential class members will have 75 days from the mailing of the Notice and Consent Forms to return their signed Consent Forms to Plaintiff's counsel for filing with the Court.

5.   Within five (5) days after Plaintiff provides Defendants a copy of the revised Notice, Defendants shall post the Notice in their office where members of the FLSA Collective Class are likely to view it. Defendants may remove the notice after 75 days.

6.   Plaintiffs may send a reminder notice 20 days before the end of the opt-in period to any and all potential class members how have not yet returned the Opt-In Consent Forms.

Doc. 46 at 8-9. Plaintiff revised the Notice pursuant to Judge Gonzales's Order and the Notice was issued on June 16, 2020.

In her Motion for Protective Order, Plaintiff alleges that Defendant Christopher Tapia, CEO and President of Defendant Armada Skilled Home Care of NM LLC, engaged in coercive and otherwise improper communications with potential members of the class and collective that have interfered and tainted the Court's management of this action. Doc. 48 at 1. Plaintiff explains that on June 16, 2020, the same day that potential opt-in plaintiffs first received the court-approved Notice of the collective action *via* email and text message, Defendant Tapia sent a text message to current Armada employees claiming that the Notice did not contain all the information ordered by the Court. *Id.* Specifically, Defendant Tapia's text message claimed that, "[t]he notices fail to mention that the attorneys receive a large portion of the settlement and that if the employees do not prevail in the case that they are responsible for the costs." *Id.* at 2. When Plaintiff learned of Defendant Tapia's text message, Plaintiff's counsel contacted defense counsel and demanded that (1) Defendant Tapia immediately retract his message and send a corrective message; (2) Defendant Tapia confirm and attest that he will refrain from any further communications about this lawsuit with any current or potential opt-in plaintiff; and (3) Armada

4

confirm, attest, and provide photographic proof that the notice is posted in Armada's office where members of the FLSA collective class are likely to view it. Doc. 48 at 6.

Plaintiff argues that Defendant Tapia's communication was a "misleading, coercive . . . attempt to undermine the purposes of a collective action." *Id.* In support, Plaintiff asserts that (1) the Notice included the information alleged to have been excluded; (2) the text message suggests that Plaintiff's counsel are incompetent and willfully violated a Court order in hiding relevant information regarding potential consequences of participation in the class action; (3) the text message implies that the case is attorney-driven and the opt-in plaintiffs who join have relatively little to gain compared to the fees the attorneys will seek; (4) the text message leaves out critical information that if there is no recovery the opt-in plaintiffs will not be responsible for any attorneys' fees whatsoever; and (5) the text message was sent to current employees with whom Defendant Tapia has an ongoing employer-employee relationship and a significant power imbalance, and that Defendant Tapia failed to mention that he is prohibited from engaging in retaliation if a current employee were to opt-in. *Id.* at 4-6. Plaintiff asks this Court to (1) bar Defendant Tapia, his lawyers, employees and agents, from any further *ex parte* communications regarding this action with represented parties or potential class and collective action members; (2) authorize dissemination of a corrective notice, at Defendants' expense, to all potential class and collective action members to whom he sent the text message; and (3) to enter an order requiring Defendants to provide documents and information about Defendant Tapia's contacts with potential class and collective action members. *Id.* at 2. Plaintiff also seeks sanctions in the amount of her reasonably incurred attorneys' fees and costs in filing this motion. *Id.*

Defendants contend that the Motion for Protective Order should be denied because Defendant Tapia did not commit misconduct by sending out a text to his employees correcting

what he believed was an improper Notice sent by Plaintiff. Doc. 54 at 1. Defendants explain

that on June 16, 2020, Defendant Tapia received a text message from an employee telling him

that she had received notice of the lawsuit and sent him a copy of what was provided to her. *Id*

at 2. Based on what the employee sent to him, Defendant Tapia believed that the Notice did not

comply with the Court's order. *Id.* Defendant Tapia then asked the employee if she had

received anything else, to which she responded by sending him "another link with another

consent to join the lawsuit." *Id.* Defendant Tapia then responded through a text message to his

current employees as follows:

> Hello, I wanted to let you know that some of the employees have notified me that
> they are receiving notices regarding the lawsuit against Christopher Tapia and
> Armada home care.
>
> The notices fail to mention that the attorneys receive a large portion of the
> settlement and that if the employees do not prevail in the case that they are
> responsible for the costs. These provisions were ordered by the court.
>
> We are working on getting the correct of notice sent out.
>
> The choice to join the lawsuit is yours and yours alone.

Doc. 55-2 at 1.

On June 17, 2020, having learned that the Notice did in fact comply with respect to the

Court ordered information he thought was excluded, Defendant Tapia retracted his message to

employees as follows:

> This message is to retract yesterday's message regarding the lawsuit versus
> Armada and Christopher Tapia.
>
> I was incorrect. The information regarding attorney compensation and court cost
> allocation is included in page 2 of the notice that you received. The relevant
> information is under the title "what is the effect of joining the suit[.]"
>
> I apologize for the error.

If you have any further questions [y]ou'll need to contact the plaintiffs attorneys as I will not be discussing this lawsuit with anyone.

Thank you.

Doc. 55-3 at 1. Defendant Tapia submitted a sworn Affidavit attesting to the events as described above. Doc. 55.

Defendant Tapia's text message aside, Defendants raise the issue in their Response that the electronic Notice sent by Plaintiff was improper because it included two "click throughs" that allow potential opt-in plaintiffs to join the class action *via* a hyperlink. Doc. 54 at 2. Defendants argue that "[t]here was never any indication to the Court or Defendants' counsel that Plaintiff intended to use a hyperlink [in the Notice]," and further that Plaintiff failed to provide the final Notice indicating the use of hyperlinks to Defendants before disseminating it as required by the Court. *Id*. at 2, 7-8. Additionally, Defendants argue that the first hyperlink is placed at the top of the first page of the electronic Notice and before the Court-ordered text on the second page. *Id.* at 5. Defendants assert that the placement of the first hyperlink could lead a potential opt-in plaintiff to join the lawsuit without having read the information regarding attorney fees and court cost allocation as required by the Court.[2] *Id.*

Defendants request that this Court (1) order Plaintiff to withdraw the improper electronic notice that contains the hyperlinks; (2) approve the "actual notice" with the click throughs removed or limited to only one at the end of the Notice; and (3) order Plaintiff to pay Defendants' attorney fees for having to respond to this Motion for Protective Order. Doc. 54 at 13.

---

[2] Defendants state that they have only received a "paper copy" of the Notice and not the actual Notice sent to potential opt-in plaintiffs *via* text and email that includes the hyperlinks. Doc. 54 at 8, n. 2. Defendants further state that they did not consent to a Notice with hyperlinks but that "if Plaintiff insisted on sending that notice with both click throughs, Defendants would have sought intervention from the Court." Doc. 54 at 8.

In her Reply, Plaintiff contends that even though Defendant's Tapia posits that his communication was not intended to discourage potential class members from participating in the class action, it has.  Doc. 57 at 1.  In support, Plaintiff states that in the thirty days since the Notice issued, only 11 employees have opted-in, none of whom are from the 82 current employees noticed and who received Defendant Tapia's text message.[3]  *Id.* at 2.  Plaintiff claims this is evidence that Defendant Tapia's text message undermined the Notice by "misleading, confusing, and coercing" current employees to not join the action.  *Id.*  at 3-4.

As for the alleged improper Notice with hyperlinks, Plaintiff states as an initial matter that Judge Gonzales's Memorandum Opinion and Order of Conditional Certification did not require that Plaintiff get approval from Defendants before sending out the modified Notice.  Doc. 57 at 5.  That aside, Plaintiff explains that as a courtesy she provided a copy of the modified Notice with "tracked changes" incorporating the language as ordered by the Court, and also provided a "clean" version for Defendants to post in Armada's office.  *Id.* at 5-6.  Plaintiff explains that this paper version of the Notice was submitted to the Court, revised as ordered by the Court, and mailed to potential opt-in plaintiffs *via* U.S. Mail.  *Id.* at 6.  As for the Notice sent *via* electronic methods, Plaintiff argues that it is customary that electronic forms of FLSA notice provide for opt-in forms to be signed electronically, and that the paper and electronic opt-in forms are otherwise identical.  *Id.*  As for the placement of the hyperlinks, Plaintiff explains that there is a logical reason to include a hyperlink near the top of the notice because viewing the Notice on an electronic device limits visibility without scrolling and potential opt-in plaintiffs need to know that they must affirmatively act to participate in the lawsuit.  *Id.* at 7.  That aside,

---

[3] Plaintiff explains that 222 individuals were provided Notice – 140 past employees and 82 current employees.  Doc. 57 at 2.

Plaintiff contends that Defendants' argument necessarily fails because to date only seven individuals have opted into the collective action by electronic means. *Id.* As such, Defendants' claim that Plaintiff is attempting to lure uninformed opt-in plaintiffs by having a hyperlink at the top of electronic document is baseless. *Id.*

## **LEGAL STANDARD**

The decision to issue a protective order rests within the sound discretion of the trial court. *Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir. 1990). Such protection is warranted, upon a showing of good cause, to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). A party seeking a protective order under Rule 26(c) cannot sustain the burden of demonstrating good cause merely by relying upon speculation or conclusory statements. *Tolbert-Smith v. Bodman*, 253 F.R.D. 2, 4 (D.D.C. 2008). The movant "must submit a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Landry v. Swire Oilfield Servs., L.L.C.*, 323 F.R.D. 360, 398 (D.N.M. 2018) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981)) (quotation marks omitted).

As in Rule 23 class actions, courts have the authority to govern the conduct of counsel and parties in § 216 collection actions. *Hoffmann-La Roche Inc. v.  Sperling*, 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989); *see also Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) (Federal Rule of Civil Procedure 23(d) grants courts "broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties" when necessary to prevent abuse of the class action mechanism.); Manual for Complex Litigation (Fourth) § 21.12, at 247 (2004) ("Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification."). This includes the

authority to limit or otherwise monitor communications between the parties and the potential

class members.  *See, e.g., In re School Asbestos Litigation*, 842 F.2d 671, 683 (3d Cir. 1988);

*Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1206 (11th Cir. 1985).  In determining whether a

party's communication to putative class members may be restricted, the moving party must make

an evidentiary showing of actual or threatened abuse by the party sought to be restrained.

*Kleiner*, 751 F.2d at 1205.  The party seeking a protective order must make two showings: first, a

communication has occurred or is threatened to occur, and second, the form of the

communication at issue is abusive and threatens the proper functioning of the litigation.  *Ojeda-*

*Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1378 (S.D. Ga. 2009).  Even if the two showings

are met, however, any resulting order "limiting communications between parties and potential

class members should be based on a clear record and specific findings that reflect a weighing of

the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*,

452 U.S. at 101.  The protective order must be carefully drawn so that it interferes with free

speech as little as possible.  *Id.* at 102 (citing *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977),

*cert denied*, 434 U.S. 985 (1977) (court must give explicit consideration to the narrowest

possible relief that would protect the respective parties)).

      In evaluating whether a defendant's communications to potential class members are

"confusing and misleading," courts "must examine the context in which the communications

were made and the effect of the communications." *Stransky v. Healthone of Denver, Inc.*, 929 F.

Supp. 2d 1100, 1109 (D. Colo. 2013).  Thus, the context of an existing employment relationship

between the parties "is of particular concern," as such a relationship "itself may increase the risk

that communications will have a coercive effect*." Id; see also Mueller v. Chesapeake Bay*

*Seafood House Assoc.,* No. 17cv1638, 2018 WL 1898557, at *7 (D. Md. Apr. 20, 2018) ("[I]n

the context of an employee-employer relationship, there is an increased risk of coercion when the employer communicates with an employee about litigation for which the employee is a potential plaintiff.")  While "the mere existence of [an employment] relationship is not enough to justify restricting the defendant's communications," such a relationship creates "[a] risk of explicit and implicit coercion" and "can transform suggestions, requests, or observations into directives or threats."  *Agerbrink v. Model Serv. LLC*, No. 14cv7841, 2015 WL 6473005, at *5 (S.D.N.Y. Oct. 27, 2015).

Examples of abusive communications warranting court intervention include misleading communications to class members regarding the litigation, communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications designed to undermine confidence in class counsel.  *See Hampton Hardware, Inc. v. Cotter & Co., Inc.* 156 F.R.D. 630, 632 (N.D. Tex. 1994) (citations omitted); *see also In Re School Asbestos Litigation*, 842 F.2d at 683 n. 23 (collecting cases involving Rule 23(d) communication orders)[4]; *Cox Nuclear Med. v. Gold Cup Coffee Servs.*, 214 F.R.D. 696, 697-98 (S.D. Ala. 2003) ("Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce

---

[4] *See, e.g., Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d 1193 (11th Cir. 1985) (defendant bank conducted covert telephone campaign with explicit purpose of soliciting opt-outs from potential class members); *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843 (2nd Cir. 1980) (defendant sent letters commenting on the litigation to class members, warning them of the costs of suit and urging them not to participate); *Haffer v. Temple Univ.*, 115 F.R.D. 506 (E.D. Pa. 1987) (representatives of defendant university made false and misleading statements to members of plaintiff class, inaccurately describing it and indicating that only one attorney was representing it, and engaged in written and oral communications intended to discourage them from meeting with class counsel); *Tedesco v. Mishkin*, 629 F. Supp. 1474 (S.D.N.Y. 1986) (defendant sent unauthorized, false, misleading and inherently coercive letter, written by defendant but signed by class member sympathetic to defendant, to class plaintiffs, attacking class counsel and discouraging participation in class action); *Impervious Paint Indus., Inc., v. Ashland Oil*, 508 F. Supp. 720 (W.D.Ky.) (defendant communicated with class members, advising that evidentiary proof of claim would be required for recovery and that class members might be subjected to discovery and other legal procedures, which communications appeared to have resulted in a large number of opt-outs among contacted class members), *appeal dismissed,* 659 F.2d 1081 (6th Cir. 1981).

prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel.")

"Courts have ordered a variety of remedial measures for misleading and improper communications, including prohibiting further *ex parte* communications, issuing corrective notices, extending the opt-in period, and awarding attorneys' fees." *Stransky*, 929 F. Supp. 2d at 1109.  Remedial measures "must be narrowly tailored to avoid impinging upon the parties' constitutional rights of free speech and association." *Id.* (citing *Gulf Oil*, 452 U.S. at 102). Generally, "an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy first amendment concerns if it is grounded in good cause and issued with a 'heightened sensitivity' for first amendment concerns." *Kleiner*, 751 F.2d at 1205. Courts consider four factors to determine whether good cause exists to restrict *ex parte* communications: the severity and likelihood of perceived harm; the precision with which the order is drawn; the availability of a less onerous alternative, and the duration of the order.  *Nez v. Southwest Glass and Glazing, Inc.,* No. 15cv1041 RJ, 2017 WL 5152984, at *3 (D.N.M. Jan. 19, 2017) (citing *Belt v. Emcare, Inc*., 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003)).

## ANALYSIS

A.   **Plaintiff Has Failed To Show that Defendant Tapia's Text Message To Potential Opt-In Plaintiffs Was Misleading, Coercive, or Intended to Undermine the Collective Action**

Plaintiff has demonstrated that Defendant Tapia made a communication to potential opt-in plaintiffs when he sent a text message related to this litigation.  The question, therefore, is whether the record shows clear and specific evidence that the communication was abusive and threatens the proper functioning of the litigation.  *Ojeda-Sanchez*, 600 F. Supp. 2d at 1378.  For

the reasons discussed below, the Court finds that although Defendant Tapia sent the responsive

text message in misinformed haste, the communication does not rise to the level of misleading or

coercive communication, nor is it an attempt to undermine the collection action.  As such, it is

not abusive nor does it threaten the proper functioning of the litigation such that the relief

Plaintiff requests is warranted.

      First, the Court finds that Defendant Tapia's text message was not misleading because it

does not discuss or mischaracterize the *claims* in the lawsuit, but instead alerted the potential

opt-in plaintiffs, albeit incorrectly, that certain information regarding attorney fees and court cost

allocation was missing from the Notice as ordered by the Court.[5]  This single act does not rise to

the level of misleading information as borne out by relevant case law.  *See, e.g., Stransky,* 929 F.

Supp. 2d at 1106 (court had inherent authority to restrict defendant employer's *ex parte*

communications with putative class members where employer unilaterally communicated with

putative class members through mandatory in-person meetings in violation of court's class

notice, employer unequivocally misrepresented the law and provided confusing information on

certain aspects of the class action, and where two putative class members testified they felt

intimidated by employer's communications); *Belt v. Emcare, Inc.,* 299 F. Supp. 2d 664, 668

(E.D. Tex. Dec. 18, 2003) (defendant mislead potential class members by sending a pre-notice

letter that suggested the action was an attack on potential plaintiffs' status as professionals,

mischaracterized the damages available to potential plaintiffs by ignoring recoverable liquidated

damages, and represented that attorney fees would be deducted from the recovery when attorney

---

[5] The claims in this lawsuit relate to Defendants' alleged violations of the Fair Labor Standards Act, the New Mexico Minimum Wage Act, and the New Mexico Wage Payment Act.  Doc. 38.  Plaintiff alleges that Defendants knowingly failed to pay their home health workers all overtime premium wages due for the overtime work they performed despite classifying them as non-exempt under the FLSA and eligible for overtime pay.  *Id.*

fees were available as a separate element of damage); *Haffer v. Temple Univ.*, 115 F.R.D. 506

(E.D. Pa. 1987) (representatives of defendant university made false and misleading statements to

members of plaintiff class, inaccurately describing the class and indicating that only one attorney

was representing it, and engaged in written and oral communications intended to discourage

them from meeting with class counsel); *Erhardt v. Prudential Group, Inc.,* 629 F.2d 843, 845

(2nd Cir. 1980) (enjoining defendants from communications with class members, *inter alia*, after

defendants sent letters to potential class members commenting on the litigation).  Here, the

communication at issue was about information Defendant Tapia mistakenly believed was

omitted in the Notice, while at the same time providing assurances that Defendants were working

to get the correct Notice sent out.  The Court, therefore, is not persuaded that Defendant Tapia's

text rises to the level of the improper *ex parte* communications; *i.e.,* holding mandatory meetings

where false information about the lawsuit is being disseminated to potential opt-in plaintiffs,

engaging in a letter campaign commenting on the litigation, or initiating unilateral

communications with putative class members for the purpose of making false and misleading

statements about the litigation.  Moreover, even if Defendant Tapia's characterization of the

omitted information concerning attorney fees and court cost allocation was wrong, the Notice

itself provides accurate information concerning attorney fees and costs in the litigation and

provides contact information for Plaintiff's counsel for any questions or concerns about the

information contained in the Notice.[6]  *See Bass v. Pjcomn Acquisition Corp.*, No. 09cv1614

---

[6] Plaintiff states in her Motion for Protective Order that in the days after Defendant Tapia sent his message that two potential plaintiffs contacted Plaintiff's counsel claiming they wanted to opt in but would not join if they could be held individually responsible for attorney fees.  Doc. 48 at 5.  The Court notes, however, that Plaintiff does not state if these potential opt-in plaintiffs were recipients of Defendant Tapia's text message.  Additionally, in her Reply, Plaintiff states that so far *none* of the 82 current employees who received the text message had opted in.  It would seem that if the two potential plaintiffs who contacted Plaintiff's counsel were current employees who had received the text, and assuming Plaintiff's counsel was able to clear up the alleged misapprehension from Defendant Tapia's text related to costs, there should be two opt-ins of the 82 current employees.  In other words, it is not clear that

REB/MEH, 2011 WL 902022, at *4 (D. Colo. March 14, 2011). In sum, the Court is not

persuaded that Defendant Tapia's message informing potential opt-in plaintiffs about the

omission of attorney fees and court allocation costs necessarily implies that the case is attorney

driven, that plaintiff's counsel is incompetent by failing to comply with Court orders, or that

plaintiffs have little to gain and are responsible for costs of the action.  Moreover, Defendant

Tapia's retraction text sent the very next day expressly admitted he was incorrect about the

omission and directed potential opt-in plaintiffs to plaintiff's counsel to answer questions about

the class action.

   Next, the Court finds that Defendant Tapia's text message was not coercive.  As an initial

matter, it is undisputed from the briefing that Defendant Tapia did not unilaterally initiate the

communication with the Armada employee that prompted his responsive text message.  Instead,

an employee texted him about having received the Notice and sent a copy of what she received.

Concerned that the Notice was incomplete, Defendant Tapia then took the extra step to ask if the

employee had received anything else.  That being said, Defendant Tapia's text message does not

threaten, state, or even suggest that joining the lawsuit could affect the potential class members'

employment, nor does it discourage or suggest that employees should not join the class action.

*See, e.g., Nez.,* 2017 WL 5152984, at *4 (enjoining Defendant from engaging in *ex parte*

communications where Defendant discouraged employees from joining the suit, attempted to

force plaintiffs who had joined to drop their claims, instigated threats of violence against certain

plaintiffs based on their participation, and suggested another employee have his form torn up);

*Belt*, 299 F. Supp. 2d at 668 (Defendant's pre-notice letter to potential class members was

---

these two phone calls inquiring about attorney fees are directly related to alleged misapprehension as a result of
Defendant Tapia's text message to Armada's current employees.

coercive where it preyed upon fears and concerns that this action could affect the potential class members' employment because it equated the wage claim action to a malpractice suit and suggested that it could "affect ongoing clinical operations"); *Hampton Hardware*, 156 F.R.D. at 631-32 (restriction imposed for three unsolicited letters sent by defendant to putative plaintiffs discussing lawsuit's potential harm to the company and expressly urging employees not to join the lawsuit); *Tedesco v. Mishkin*, 629 F. Supp. 1474 (S.D.N.Y. 1986) (defendant sent unauthorized, false, misleading and inherently coercive letter, written by defendant but signed by class member sympathetic to defendant, to class plaintiffs, attacking class counsel and discouraging participation in class action). Further, Defendant Tapia concluded the text message with "[t]he choice to join the lawsuit is yours and yours alone." Doc. 48-2 at 2. And while it is correct that Defendant Tapia's concluding remark does not explicitly state that an employee could not be retaliated against for joining the class action, the Court is not persuaded that the absence of this language renders the statement unclear or suggests an undisclosed intent to retaliate if an employee chooses to join the class action. Moreover, in Defendant Tapia's retracting text message sent the following day, and in his sworn Affidavit, Defendant Tapia admitted error, directed employees to contact plaintiff's attorneys with questions, and stated he would not be discussing the lawsuit with anyone. Doc. 55. Lastly, although Plaintiff speculates that Defendant Tapia's text is the reason no current employee had opted-in as of the date of her Motion for Protective Order, Plaintiff has not presented actual evidence that any employee has been threatened, intimidated, or discouraged from joining the class action. Further, mere questions to Plaintiff's counsel about class action related attorney fees are insufficient to

demonstrate that Defendant Tapia's text message was an effort to coerce putative class members from joining.[7]

Finally, the Court finds that Defendant Tapia's text message was not an attempt to undermine the collection action.  *See, e.g., Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 564 (S.D. Fla. May 9, 2008) (finding that Defendant's communications with its customers linking the class action lawsuit with negative consequences – the withholding on necessary repairs to defective windows – threatened the proper functioning of the litigation and required a procedure for communications); *Erhardt,* 629 F.2d at 843 (enjoining Defendants from communications with class members, *inter alia,* after Defendants sent letters to potential class members warning them that a successful defense might make them liable for costs and urging them to disassociate themselves from the lawsuit); *Kleiner,* 751 F.2d 1193 (defendant bank conducted covert telephone campaign with explicit purpose of soliciting opt-outs from potential class members); *Impervious Paint Indus., Inc., v. Ashland Oil,* 508 F. Supp. 720 (W.D.Ky. Feb. 9, 1981) (defendant communicated with class members, advising that evidentiary proof of claim would be required for recovery and that class members might be subjected to discovery and other legal procedures, which communications appeared to have resulted in a large number of opt-outs among contacted class members), *appeal dismissed,* 659 F.2d 1081 (6th Cir. 1981).  Here, Defendant Tapia's text message, although incorrectly stating that attorney fees and court allocation costs had been omitted from the Notice as ordered by the Court, also stated that "[w]e are working on getting the correct [sic] of notice sent out."  Doc. 48-2 at 2.  Further, within approximately twenty-four hours of having sent the text message, Defendant Tapia retracted the text message, admitted he was incorrect, directed current employees to the relevant information,

---

[7] *See* fn. 6, *supra.*

apologized for the error, directed potential opt-in plaintiffs to contact plaintiff's attorneys with any further questions, and stated he would not be discussing the lawsuit with anyone.  Doc. 55-3. Moreover, Defendant Tapia's second text message fully complied with Plaintiff's demands made after learning about the text; *i.e.,* that Defendant Tapia immediately retract his message, send a corrective message, and confirm and attest that he will refrain from any further communications about this lawsuit with any current or potential opt-in plaintiff.[8]  Doc. 48 at 6; Doc. 55-3.  The Court, therefore, is not persuaded that Defendant Tapia's text message was an attempt to undermine the collection action.

For all of the foregoing reasons, the Court finds that although Defendant Tapia communicated to potential opt-in class members, Plaintiff has failed to show that Defendant Tapia's text message was misleading, coercive, or intended to undermine the collection action. As such, the Court does not find that the form of communication was abusive or threatens the proper functioning of the litigation.

**B.**     **Class Members Should Be Allowed To Electronically Execute Their Consent Forms**

Defendants take issue with the form of Notice Plaintiff sent *via* text and email arguing that it contains hyperlinks it did not agree to when it approved the form of the Notice.  As an initial matter, the Court agrees with Plaintiff that Judge Gonzales's Memorandum Opinion and Order of Conditional Certification did not require that Plaintiff get approval from Defendants before sending out the Notice.  Doc. 54 at 4.  To the contrary, Judge Gonzales ordered, *inter alia,* that

---

[8] Defendant Tapia also attested and provided a photo of the Notice posted in Armada's office in compliance with Plaintiff's demand that he do so; *i.e.,* that Armada confirm, attest, and provide photographic proof that the notice is posted in Armada's office where members of the FLSA collective class are likely to view it.  Doc. 48 at 6, Doc. 55-5.

4.      Plaintiff shall revise the proposed Notice as set forth above and send the revised Notice and Opt-In Consent Form by first-class U.S. Mail, email, and text message to all members of the FLSA Collective Class. . . .

5.      Within five days after Plaintiff provides Defendants a copy of the revised Notice, Defendants shall post the Notice in their office where members of the FLSA Collective Class are likely to view it. . . .

Doc. 46 at 8-9.  Nowhere in Judge Gonzales's Memorandum Opinion and Order of Conditional Certification did he order the Plaintiff get approval from Defendants on the revised order before sending out the Notice.

As to the issue of hyperlinks in the electronic form of the Notice, recognizing that "we live in a time when all manner of commercial transactions are routinely cemented by electronic submission," *Mraz v. Aetna Life Ins. Co.*, 2014 WL 5018862, at *5, 2014 U.S. Dist. LEXIS 142923, at *5, courts have approved the use of online electronic signature opt-in forms.  *Landry v. Swire Oilfield Services, L.L.C.,* 252 F. Supp.3d 1079, 1130 (D.N.M. May 2, 2017) (citing *Dyson v. Stuart Petrol, Testers, Inc*., 308 F.R.D. 510, 517 (W.D. Tex. Aug. 27, 2015); *Bland v. Calfrac Well Servs. Corp*., 2013 WL 4054594, at *1 (W.D. Pa. Aug. 12, 2013); *White v. Integrated Elec Techs., Inc.,* 2013 WL 2903070, at *9, 2013 U.S. Dist. LEXIS 83298, at *9 (E.D. La. June 13, 2013)).  Indeed, the Federal Rules of Civil Procedure and New Mexico law expressly allow the use of electronic signatures.  *See* Fed. R. Civ. P. 5(d)(3) ("A court may . . . allow papers to be filed, signed or verified by electronic means . . . ."); N.M. Stat. Ann. § 14-16-7(c).  Accordingly, the Court finds that when Judge Gonzales authorized Notice by email and text message, that authorization anticipated class members to execute their consent forms electronically.

For these reasons, the Court finds that Plaintiff's electronic Notice with hyperlinks is not improper.

## CONCLUSION

The Court finds that neither Plaintiff nor Defendants are entitled to the relief they seek at this time. That said, the Court reminds the parties that it is mindful of the risks of coercion and abuse in certain relationships, particularly in employment relationships, and urges the parties to be especially cognizant of any issues or problems that may arise as a result of the pending litigation.

## RECOMMENDATION

For all of the foregoing reasons, the Court recommends that Plaintiff's Emergency Motion for Protective Order, Issuance of Corrective Notice, and Sanctions be **DENIED.**

The Court further recommends that Defendants' request that Plaintiff withdraw their electronic notice with hyperlinks be **DENIED.**

Finally, the Court recommends that each party bear their own costs in filing and responding to Plaintiff's Motion for Protective Order.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**